[840 NYS2d 334]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JONATHAN JENKINS, Appellant.

First Department, July 26, 2007

**APPEARANCES OF COUNSEL**

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Margaret E. Knight* and *Rosemary Herbert* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Gregory H. Mansfield* and *Sandra E. Cavazos* of counsel), for respondent.

**OPINION OF THE COURT**

Buckley, J.

On December 6, 1999, defendant, after consulting his attorney, offered to plead guilty to criminal sale of a controlled substance in the fifth degree in full satisfaction of the grand jury indictment charging him with criminal sale of a controlled substance in the third degree. He understood the trial rights he was giving up, and he admitted that on June 4, 1999 he had

sold crack cocaine to another individual on Lenox Avenue and 126th Street. The court promised that, if defendant successfully completed a residential Drug Treatment Alternative to Prison (DTAP) program, the case would be dismissed, although the record would not be sealed. If the DTAP program rejected his application, he would not be permitted to withdraw his plea, and would be sentenced to 2 to 4 years' imprisonment. The court emphasized:

> "Now, the only promise I have made is if accepted by the DTAP Program you would be placed in a residential program for 18 to 24 months or however long it takes you to complete that program. If you successfully complete that residential program this case will be dismissed, but . . . the record will not be sealed."

The court further stated that defendant would have to cooperate with the Probation Department, return to court on scheduled dates, and not be rearrested.

Defendant did not challenge the predicate felony statement, and was adjudicated a second felony offender. He then pleaded guilty to criminal sale of a controlled substance in the fifth degree, and was notified that his violation of probation for a 1998 conviction for attempted criminal possession of a controlled substance in the third degree would be terminated when he was sentenced on the instant crime.

Defendant also entered into a court-approved written plea agreement with the Special Narcotics Prosecutor. The agreement provided that his sentencing would be adjourned until August 2001. During the adjournment period, defendant was to successfully complete a residential drug treatment program at Veritas Therapeutic Community (Veritas). "Successful completion" would "include[ ] completing vocational educational training, obtaining a General Equivalency Diploma, securing full-time employment, and finding suitable housing approved by the Enforcement Team of the Office of Special Narcotics Prosecutor (OSN)." Failure to successfully complete the program by August 2001 would automatically extend the sentencing date to the anticipated date of defendant's successful completion.

If defendant successfully completed the program, "including the after-care or live-out phase of treatment," and committed no new crimes, OSN would join his application to dismiss the indictment in the interest of justice.

If he elected to terminate treatment or were discharged from the program, but voluntarily surrendered himself to the court

or OSN within 12 hours of leaving the program, he would be sentenced to 2 to 4 years' imprisonment.

If defendant left the program "or otherwise fail[ed] to successfully complete treatment as determined by the program," and did not return to court within 12 hours, a warrant would be issued for his arrest and he would be sentenced to 3½ to 7 years' imprisonment.

The issue of whether or not defendant violated the terms and conditions of the agreement was to be "at the sole discretion of OSN and the Court."

Defendant entered the Veritas program in January 2000, completed the residential treatment on March 30, 2001, and thereafter began the aftercare phase.

On October 4, 2001, defendant's attorney filed a *Clayton* motion to dismiss the case in the interest of justice,[1] on the ground that defendant had fulfilled the conditions of his plea agreement. By letter dated October 11, 2001, defendant's case manager at Veritas stated that defendant had "completed all phases of drug treatment," but had "unresolved family issues that have created and will eventually create further problems for him and his significant other . . . if not addressed." The girlfriend had failed to attend scheduled assessments and family services.

On October 12, 2001, defendant and his attorney appeared before Justice Dora L. Irizarry. The People requested an adjournment of two to three weeks to respond, and for defendant to provide documentation, such as his GED diploma, proof of completion of vocational training, pay stubs, and bank statements. Following the ensuing bench conference, defense counsel withdrew the *Clayton* motion "at this time" and requested an adjourn date in November, presumably in recognition of the need to satisfy the People's demand that he produce proof of compliance with all the terms of the plea agreement.

The court stated on the record that, during the bench conference, there had been "an indication that [defendant was] having some kind of attitude problems and some resistance when things are being asked of [him] in terms of documentation and proofs and things like that." Taking cognizance of the Veritas case manager's report that defendant had some unresolved domestic issues that were causing problems, the court informed defendant that the DTAP office would "possibly [be] looking

---

1. *People v Clayton*, 41 AD2d 204 (1973); CPL 210.40.

into some other support services for [him] . . . just . . . to make sure that there's nothing else in [his] life that might cause [him] to relapse," which was "all for [his] own benefit." Defendant asserted that he had "completed everything there is to complete in this program," and asked "how much more services" he needed. He maintained that he was attending family assessment meetings, but could not force his live-in girlfriend of five years to do so. The court responded that there might be a program other than Veritas that was more suitable for defendant. After defendant confirmed that he would have to produce pay stubs and other documentation in order to satisfy the plea agreement requirements for dismissal of his case, the matter was adjourned until November 16, 2001.

On October 23, the prosecutor informed defense counsel that defendant's housing would not be deemed suitable if he continued to live with his girlfriend while she failed to attend counseling. On November 2, defendant was arrested in New Jersey for assaulting the girlfriend. On November 14, defendant informed the prosecutor that he had lost his job.

On December 8, 2001, defendant and his girlfriend reported to Veritas for an assessment, and committed to at least four family counseling sessions. By letter dated January 31, 2002, a Veritas supervisor informed the court that defendant's standing with the program was "questionable," due to his poor attendance, minimal commitment, and failure to seek assistance from the vocational department to remedy his unemployed status.

Appearing before Justice Arlene D. Goldberg on February 5, 2002, defendant agreed to attend biweekly group meetings, biweekly individual vocational counseling until he obtained employment, weekly family counseling with his girlfriend, and to submit to drug screening at least twice per month. After conferring with counsel, defendant stated that he understood and agreed to the those terms, denied that anyone was forcing him or pressuring him to do so, and signed an agreement in open court.

On April 23, 2002, Veritas terminated defendant for lack of face-to-face contact for more than 30 days, failure to communicate with staff his reasons for nonattendance, and failure to respond to numerous outreach calls. A bench warrant was issued, and he was returned involuntarily on May 28, 2003. In the interim, he was arrested in New Jersey on October 11, 2002 on a drug charge, and on May 6, 2003 for shoplifting.

In August 2003, defendant renewed his *Clayton* motion, arguing that, as of his original motion in October 2001, he had satis-

fied all terms of his plea agreement, and that thereafter the court imposed new conditions. However, on June 6, 2004, defendant, having conferred with counsel, asked to withdraw the motion without prejudice to pursuing his arguments on appeal. The court granted the request and sentenced defendant to a prison term of 3½ to 7 years.

Defendant, and the dissent, take the position that, upon receiving the October 2001 letter from Veritas attesting to defendant's completion of "all phases of drug treatment," Supreme Court was obligated to dismiss the indictment in the interest of justice, without further inquiry. However, as was made clear at the October hearing, the Veritas letter did not address other specific requirements of defendant's plea agreement, such as completion of vocational training, obtaining a GED, and securing employment. The court adjourned the hearing so that defendant could submit proof that he had satisfied those requirements, and presumably that is the reason counsel withdrew his *Clayton* motion. Indeed, the court noted following the bench conference that defendant had evinced "some kind of attitude problems and some resistance . . . in terms of documentation and proofs and things like that."

A "sentencing court must assure itself that the information upon which it bases the sentence is reliable and accurate," including whether or not the defendant has complied with the conditions of a plea agreement, and the nature and extent of the inquiry is within the court's discretion (*People v Outley*, 80 NY2d 702, 712, 713 [1993]). Therefore, the court properly adjourned the matter to determine whether defendant had complied with the terms of his agreement.

Prior to the adjourn date, defendant was arrested for committing a new crime (a violation of his plea agreement) and lost his job (another violation of the plea agreement). In addition, OSN made the determination, as it was empowered to do under the plea agreement, that if defendant persisted in living with his girlfriend without bringing her to family counseling, his housing would not be deemed "suitable" (a third violation of the plea agreement). Nevertheless, defendant was permitted to voluntarily enroll with his girlfriend in family counseling with Veritas. By the time of his next court appearance, in February 2002, defendant was still unemployed and his continued participation in the program, including vocational assistance, was in jeopardy due to poor attendance and involvement. Rather than being presented with a unilateral alteration of the plea

agreement by the court (*see e.g. People v Spina*, 186 AD2d 9 [1992]), defendant, with the advice of counsel, knowingly, intelligently, and voluntarily agreed in open court to a schedule of family and vocational counseling. In light of his prior violations of the terms of the plea agreement, his ongoing unemployment, and perhaps out of a sincere desire to address a root cause of his problems, defendant's assent to attend family counseling is not surprising, and cannot be deemed as coerced.

To the extent the dissent argues that Supreme Court should have ignored those evolving circumstances and reexamined defendant's status solely as of October 2001, there was no *Clayton* motion pending at the time of the February 2002 hearing, since it had been withdrawn at the October 2001 hearing. Plea agreements should be "tailored to the particular circumstances of the defendant's case" (*People v Avery*, 85 NY2d 503, 507 [1995]), which is what Supreme Court, the People, and defendant, attempted to do in February 2002. In order to effectuate the goals of individualized sentences, starting an offender on the road to rehabilitation as soon as possible, conserving law enforcement, judicial, and penal resources, and permitting the parties to avoid the uncertainties inherent in a trial and appeal, "some judicial discretion in overseeing and approving plea bargains, including the imposition of conditions, is desirable" (*id.* at 507).

Shortly after the February 2002 hearing, defendant was terminated from the Veritas program (a violation of his February agreement and possibly the original one), absconded (a violation of the original plea terms) and was arrested for committing two new crimes (additional violations of the original plea conditions). Thus, defendant's renewed *Clayton* motion, though purportedly preserved for purposes of appeal, is not before us. The notion that a defendant could simultaneously withdraw a motion and yet preserve for review the issue raised by the motion is fraught with contradiction. Contrary to defendant's claim, the issue is not preserved, and we decline to reach it in the interest of justice. Were we to review the claim, we would find it to be without merit.[2] The court imposed the sentence promised for failure to abide by the terms of his agreement, and that sentence was not excessive. Defendant is not entitled to a reduced sentence under the Drug Law Reform Act, since his

---

2. The dissent would find defendant's claim preserved, yet faults the People for not adequately preserving their own arguments to a motion that was nonexistent, by reason of its withdrawal.

crime was committed before the act's effective date (*see People v Utsey*, 7 NY3d 398 [2006]), and we decline to reduce it in the interest of justice.

Accordingly, the judgment of the Supreme Court, New York County (John Cataldo, J., at plea; Arlene D. Goldberg, J., and Dora L. Irizarry, J., at proceedings; Michael R. Ambrecht, J., at sentence), rendered June 6, 2004, convicting defendant, upon his guilty plea, of criminal sale of a controlled substance in the fifth degree, and sentencing him, as a second felony offender, to a prison term of 3½ to 7 years, should be affirmed.

Tom, J.P. (dissenting). In permitting the People to evade their obligation to a defendant who has performed in accordance with a negotiated plea agreement, the majority allows the People to breach a binding agreement and fails in its duty to enforce a stipulated settlement entered into between the parties (*see Childs v Levitt*, 151 AD2d 318, 320 [1989], *lv denied* 74 NY2d 613 [1989]).

The People's refusal to honor the terms of defendant's sentencing agreement undermines the integrity of plea negotiations that are essential to the efficient functioning of the criminal justice system (*People v Avery*, 85 NY2d 503, 506-507 [1995]; *People v Selikoff*, 35 NY2d 227, 233 [1974], *cert denied* 419 US 1122 [1975] ["In budget-starved urban criminal courts, the negotiated plea literally staves off collapse of the law enforcement system, not just as to the courts but also to local detention facilities"]). To permit the People to evade their obligation to adhere specifically to the terms of the plea agreement negotiated with defendant would compromise the credibility of any future plea offer the People might extend to a criminal defendant. As stated by the Court of Appeals over a century ago, "Parties by their stipulations may in many ways make the law for any legal proceeding to which they are parties, which not only binds them, but which the courts are bound to enforce" (*Matter of New York, Lackawanna & W. R.R. Co.*, 98 NY 447, 453 [1885]). With respect to criminal proceedings in particular, the Court has emphasized that

> "a promise made by a State official authorized to do so and acted upon by a defendant in a criminal matter to his detriment is not lightly to be disregarded . . . . Of importance also is the detrimental effect on the criminal justice system that will result should it come to be believed that the State can renege on

its plea bargains with impunity notwithstanding defendant's performance" (*People v McConnell*, 49 NY2d 340, 349 [1980]).

Mincing no words, the Court has noted that "openness and certainty in plea negotiations are vital to the continued validity of that process" (*People v Danny G.*, 61 NY2d 169, 173 [1984]).

In December 1999, defendant entered into a written agreement with the Office of Special Narcotics Prosecutor (OSN) to plead guilty to criminal sale of a controlled substance in the fifth degree in satisfaction of the charges against him. The stipulation provides that "sentencing will be adjourned for eighteen (18) months until August 2001," during which time defendant is to successfully complete a Drug Treatment Alternative to Prison (DTAP) program. Successful completion of the program

"includes completing vocational educational training, obtaining a General Equivalency Diploma, securing full-time employment, and finding suitable housing. . . . If the defendant leaves the program without authorization, or otherwise fails to successfully complete treatment as determined by the program, . . . [t]he Court will impose a sentence of at least 3¹/₂ to 7 years of imprisonment. Whether the defendant violates the terms and conditions of this agreement is at the sole discretion of OSN and the Court. . . . If the defendant successfully completes the program, including the after-care or live-out phase of treatment, and commits no new crimes, OSN will join defendant's application to dismiss the indictment in this case in the interest of justice."

In accordance with the agreement, defendant entered a residential drug treatment program at Veritas Therapeutic Community. By June 2001, he was in the "live-out phase of treatment," residing with his family in Montclair, New Jersey, and participating in a relapse prevention aftercare program. He was both employed full time and enrolled in a vocational training program. All of his drug screening tests were negative.

In early October 2001, defendant filed a *Clayton* (*People v Clayton*, 41 AD2d 204 [1973]) motion to dismiss the indictment against him in the interest of justice (CPL 210.40), submitting a letter from his case manager confirming that he had "completed all phases of drug treatment." However, the letter also expressed the belief that defendant and his girlfriend had "unresolved family issues that have created and will eventually create fur-

ther problems for him and his significant other . . . if not addressed." The case manager indicated that Veritas had offered the couple "family services," but had been unsuccessful in attempts to secure the cooperation of defendant's girlfriend, "who failed to attend scheduled assessments and services."

At a calendar call on October 12, 2001, for reasons unknown, defendant's attorney withdrew his written *Clayton* motion following an off-the-record bench conference and requested an adjournment. Undeterred, defendant proceeded to inform the court that "I've completed everything there is to complete in this program," and asked, "how much more services do I need?" The court responded that there are "issues that you're not resolving and this is what we're going to determine during the adjournment." Defendant confirmed that it was his girlfriend who did not want to attend family counseling and added that he could not compel her attendance.

On November 2, 2001, defendant was arrested for assaulting his girlfriend. Although the charge was dismissed a month later, defendant was fired from his job in the interim. In early December, defendant and his girlfriend agreed to attend a minimum of four family counseling sessions at Veritas. In January 2002, a prosecutor with the Alternative Sentencing Bureau informed defendant that unless he completed marriage counseling, including attendance at monthly group meetings, and maintained full employment, the People would not join in his *Clayton* motion. By letter dated January 31, 2002, defendant's case manager informed the court that defendant's "standing in this program is questionable" because he was both unemployed and had failed to participate in family counseling with his girlfriend since December. As a result, on the next return date, the court remanded defendant until February 5, 2002.

During the proceedings on the adjourned date, defendant entered into a new written agreement to attend biweekly group meetings and weekly family counseling sessions with his girlfriend as well as biweekly individual counseling and drug screening until he found employment. However, in a letter dated April 17, 2002, his case manager reported that defendant's attendance was still poor and that he seemed to lack commitment to treatment and recovery. Defendant was discharged from Veritas within the week for failure "to communicate with staff reasons for not attending services" and "to respond to numerous outreach calls," resulting in "no face to face contact for more than 30 days."

When defendant did not voluntarily appear in court, a bench warrant was issued, and defendant was involuntarily returned on the warrant on May 28, 2003. NYSID records were obtained reflecting arrests in New Jersey, including the previously noted alleged assault on his girlfriend on November 2, 2001 (dismissed December 1, 2003), possession/use of "CDs" on October 11, 2002 (presumably a drug reference under New Jersey law) and shoplifting on May 6, 2003.

In late August 2003, defendant renewed his *Clayton* motion. He argued that, as of October 2001, he had successfully completed the Veritas program—as attested by his case manager's letter—received his GED, secured full time employment, resided in approved housing with his girlfriend and committed no new crimes. Thus, defendant contended, dismissal of the indictment against him in the interest of justice was required at that time. In the alternative, he requested a hearing to determine if he had violated the plea agreement.

In response, the prosecutor noted that defendant had since been discharged from Veritas, had failed to attend scheduled counseling sessions and did not voluntarily return to court. He further argued that the plea agreement vested sole discretion in the prosecutor and the court to determine if defendant had complied with its terms. The prosecutor also stressed that defendant had consented, in the February 2002 agreement, to attend family counseling sessions, which he failed to do, and that defendant had been rearrested on three occasions.

At sentencing on June 6, 2004, defendant withdrew, without prejudice, his renewed motion to dismiss the indictment on the ground that the People did not comply with the plea agreement so that he could pursue the issue on appeal. Defendant stated, "There's no due process. If I can't get an evidence hearing on whether or not I violated the plea agreement, then I have a family to get home to. I'll just go to prison so I can get home to my family." He added, "The plea agreement says that I must complete the Veritas drug treatment program. The letter is on record." The court thereupon imposed a sentence of 3¹/₂ to 7 years in accordance with the plea agreement.

On appeal, defendant argues, as he has all along, that he is entitled to specific performance of the negotiated agreement, contending that, as of October 2001, he had successfully completed the DTAP program as required to "dismiss the indictment in this case in the interest of justice." The People primarily argue that defendant waived the claims, raised on his *Clay-*

*ton* motion, that he complied with the terms of the negotiated plea agreement and that the court and the People had no authority to impose additional conditions for dismissal of the indictment in the interest of justice. The People have abandoned the argument that the prosecutor and the court have sole discretion to determine defendant's compliance with the plea agreement. They contend, rather, that the court had the discretion to set aside the plea agreement because "defendant breached its terms or failed to live up to his end of the bargain" (citing *People v Schultz*, 73 NY2d 757, 758 [1988]) and because the "court's necessary exercise of discretion cannot be fixed immutably at the time of the plea, for the sentencing decision requires information that may be unavailable at the time of the plea" (citing *People v Farrar*, 52 NY2d 302, 306 [1981] [affirming court's prerogative "to impose a sentence less than that negotiated at the time of the plea" (*id.* at 304)]).

The People first argue, disingenuously, that defendant waived the right to specific performance of the plea agreement when his attorney withdrew his *Clayton* motion on October 12, 2001. However, the People did not advance this argument in opposition to defendant's renewed *Clayton* motion. Thus, it is unpreserved for review and cannot be raised for the first time on appeal (CPL 470.05 [2]; *see People v Johnson*, 83 NY2d 831, 834 [1994]). Moreover, when, at sentence, defendant withdrew the renewed *Clayton* motion, without prejudice, the court stated, "you've obviously chosen not to pursue it in this forum. I assume you would like to make it part of your appellate process." Defendant thereupon made a record of his arguments in support of specific enforcement of the plea agreement and explained his reasons for pursuing these arguments on appeal rather than before Supreme Court, conduct that hardly evinces an intent to abandon the issue.

The circumstances surrounding counsel's withdrawal of the initial October 2001 *Clayton* motion fail to demonstrate waiver as a matter of law. The negotiated plea agreement required OSN to participate in the submission of a joint *Clayton* motion upon defendant's completion of the Veritas program, and the letter from defendant's case manager confirmed his completion of "all phases of drug treatment." While the record is unclear, it appears that counsel's withdrawal of the motion may have been precipitated by OSN's refusal to join in the application. Because there is no record of any discussions concerning the *Clayton* motion, it is unknown what the court said to defense counsel to

prompt its withdrawal "pursuant to the bench conference and my misinformation that the Judge had requested a Clayton motion." It appears, however, that the court may have refused to entertain the motion in the absence of a joint application, in which the People consented to dismissal of the indictment. In any event, it is axiomatic that the People cannot utilize their failure to comply with the terms of the plea agreement (by joining in defendant's motion) to avoid judicial review of whether they failed to specifically comply with the agreement.

Similarly unavailing is the People's contention that defendant "voluntarily" agreed to participate in additional family counseling at Veritas. At the calendar call of October 12, 2001, defendant asked the court, despite counsel's withdrawal of the motion, "how much more services do I need?" and stated that "it's going to conflict with my work." The court responded, "This is what I'm talking about. You're being very resistent [sic]." The court went on to state that "right now I'm sensing some kind of hostility here that shouldn't be here because everybody is looking out for your interest whether you recognize it or not."

At the February 5, 2002 hearing, the court was even more adamant, telling defendant, "You were doing so well. I hope you have used that time to think about whether you want to commit to this again or you just want to go to jail," to which defendant responded, "I thought about it, I am going to comply with the program." At that point, the prosecutor informed the court, "I have a letter, it is like a contract which the assigned assistant wants to read on the record and wants the defendant to sign." After a reading of the terms, defendant signed the document.

Although defendant acknowledged that nobody forced or pressured him into signing this agreement, the court, which viewed defendant as resistant and hostile, made it abundantly plain that the direct consequence of his failure to "commit" to the program would be his immediate return to jail. In light of defense counsel's inexplicable withdrawal of the Clayton motion, his failure to register any protest to the additional conditions imposed by the court for granting it and the court's clear message that resistance would lead to continued incarceration, defendant's decision to "comply with the program" can hardly be said to be the product of free will so as to be considered "voluntary, knowing and intelligent" (People v Callahan, 80 NY2d 273, 283 [1992]).

Significantly, the court made no attempt to assess the voluntariness of defendant's alleged consent to depart from the terms

of the negotiated plea agreement. "While there is no requirement that the court engage in any particular litany . . . a knowing and voluntary waiver cannot be inferred from a silent record" (id., citing People v Harris, 61 NY2d 9, 17 [1983]). The record herein is silent on the question of why defense counsel compromised his client's right to specific performance of the plea agreement by withdrawing his Clayton motion. Furthermore, the record of the subsequent proceedings on February 5, 2002 indicates that defendant was coerced into signing a separate agreement to attend family counseling sessions. The court threatened defendant that "you have to comply completely" or "go to jail." Notably absent from the proceedings was any discussion of the terms of the plea agreement or, indeed, any input from defense counsel who, apart from noting his appearance, did not utter a single word. Thus, the record fails to demonstrate " 'an intentional relinquishment or abandonment of a known right or privilege' " (Harris, 61 NY2d at 17, quoting Johnson v Zerbst, 304 US 458, 464 [1938]; see Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y., 61 NY2d 442, 446 [1984]) so as to warrant the conclusion that defendant knowingly and voluntarily abandoned the issues raised by his Clayton motion.

In a final effort to establish waiver, the People argue that defendant's withdrawal of his renewed Clayton motion when sentence was pronounced "amounted to an additional waiver of his claim." This contention is ludicrous in light of the court's assurance that defendant's claims with respect to his completion of the Veritas program and the People's failure to adhere to the terms of the plea agreement could be taken up on appeal. The court stated, "I want to make the record clear also that the withdrawal of your motion is not with prejudice. So you can pursue that as you see fit." Furthermore, defendant made a record of his reasons for electing to raise his claims on appeal rather than by way of motion, indicating that he had been unable to secure a ruling, or even a hearing, as to whether he had complied with the terms of the agreement. The record amply supports defendant's contention that his efforts to have such claims adjudicated by Supreme Court were futile.

While the People's primary appellate argument is founded upon waiver, they further intimate that Supreme Court was warranted in ignoring the terms of the negotiated plea agreement because defendant did not comply with its provisions and because subsequent events justified the imposition of additional

conditions for dismissal of the indictment. They do not contend that any term of the agreement is illegal so as to require modification (*see People v Wein*, 294 AD2d 78 [2002]). Furthermore, on this appeal, the People have abandoned their argument that defendant's compliance with the agreement is within "the sole discretion of OSN and the Court," presumably because literal enforcement of that provision would render the remainder of the plea agreement superfluous. The "sole discretion" language clearly conflicts with the provision for imposition of a sentence of incarceration should defendant "fail[ ] to successfully complete treatment as determined by the program," not as found by the court and OSN. Thus, by abandoning the argument, the People avoid an obvious ambiguity in the plea agreement that would entitle defendant to withdraw his guilty plea (*see People v James*, 251 AD2d 813 [1998]; *People v Reyes*, 167 AD2d 920, 921 [1990], *lv denied* 77 NY2d 842 [1991]; *People v Gray*, 65 AD2d 525 [1978]). Moreover, if the People were afforded unfettered discretion to attach further conditions for dismissal of the indictment, with the zealous endorsement of the court, defendant would be subjected to virtually lifelong presentence supervision to avoid incarceration.

Significantly, all of defendant's asserted violations of the plea agreement occurred after the court received the letter from his case manager attesting that he had completed the Veritas program. Thus, the People's argument that defendant's subsequent conduct constitutes a basis for avoiding their obligation to honor the plea agreement requires acceptance of their contention that defendant's performance of his obligations under the agreement is not enough to require them to honor that agreement. This reasoning is obviously circular, but it directly implicates the People's second contention that " '[a]ny sentence promise is conditioned, as a matter of law and strong public policy . . . upon the appropriateness of the sentence in light of information subsequently received by the sentencing Judge from the pre-sentence report or other reliable source' " (quoting *McConnell*, 49 NY2d at 346).

What this argument ignores is that sentence has already been negotiated and memorialized in the parties' stipulated plea agreement. The question is not whether the prosecutor or the court believed that the agreed-upon sentence was appropriate (*id.* at 345-346 [subsequently received information that defendant used a deadly weapon did not permit court to alter plea agreement after defendant acted in reliance on its terms]), the

question is whether defendant performed in accordance with the plea agreement so as to entitle him to specific performance by the People (*People v Evans*, 58 NY2d 14, 24 [1982] ["'(E)ach party to the voluntarily entered-into plea agreement is entitled to the benefits emanating from the agreement which cannot be retroactively vitiated. To hold otherwise would make a mockery of the plea bargaining process"]). As the Court of Appeals stated in *People v Frederick* (45 NY2d 520, 524 [1978]), "it is well settled that 'a guilty plea induced by an unfulfilled promise either must be vacated or the promise honored'" (quoting *Selikoff*, 35 NY2d at 241). The test of whether a party has fulfilled a promise under a plea agreement is measured by an objective assessment of its terms, not by the subjective interpretation of a party (*People v Acosta*, 187 AD2d 329 [1992], *lv denied* 81 NY2d 881 [1993]).

The People cite no authority in support of their position that they—and the court—were justified in ignoring the terms of the plea agreement and requiring defendant to comply with conditions to which he had not expressly stipulated. The agreement provides that successful completion of the Veritas program "includes completing vocational educational training, obtaining a General Equivalency Diploma, securing full-time employment, and finding suitable housing." It contemplates that sentence will be imposed only if defendant "leaves the program without authorization, or otherwise fails to successfully complete treatment as determined by the program," not as determined by the prosecutor or even the court.

The letter from defendant's case manager at Veritas dated October 11, 2001 states, unequivocally, "As of this writing, Mr. Jenkins has completed all phases of drug treatment at Veritas." The People do not contend that any other requirement of the plea agreement remained unfulfilled by defendant at that time. The only basis for the court's refusing to enforce the terms of the agreement and for coercing defendant into participating in family counseling was the case manager's letter. However, there is no provision in the plea agreement that requires defendant to undergo such counseling, and there is certainly no provision that might be interpreted as requiring defendant's girlfriend to undergo counseling. The case manager's letter did not state either that the Veritas program required defendant to participate in family counseling or that he was unwilling to attend family counseling sessions. Rather, it was defendant's girlfriend "who failed to attend scheduled assessments and services." Clearly,

the requirement that defendant—and his girlfriend—participate in family counseling was a condition unilaterally imposed by the court after defendant's guilty plea had been entered; thus, it was improper (*People v Spina*, 186 AD2d 9, 9-10 [1992]; *see Avery*, 85 NY2d at 507).

Even if defendant had not acted in reliance on the plea agreement by completing the Veritas program and this matter therefore presented an appropriate case for departing from the negotiated sentence (*Farrar*, 52 NY2d at 305-306), the record does not reveal the reasons why the court failed to adhere to the agreement negotiated by the parties. It is settled that "the reasons for departing from the sentencing agreement must be placed upon the record to ensure effective appellate review of the sentencing court's exercise of discretion" (*Schultz*, 73 NY2d at 758, citing *Danny G.*, 61 NY2d at 174). Thus, the record provides an inadequate basis upon which to sustain the court's failure to abide by the terms of the plea agreement. Nor was defendant given the right to withdraw his plea (*see Selikoff*, 35 NY2d at 241; *Farrar*, 52 NY2d at 307; *Spina*, 186 AD2d at 10).

In sum, the People have failed to establish that defendant waived his right to seek specific performance of the plea agreement or even that the court conducted an adequate inquiry to permit review of whether the purported waiver was made knowingly and intelligently. They have not demonstrated that defendant neglected to live up to his end of the plea agreement to justify their failure to join in his application for dismissal of the indictment in the interest of justice, as the agreement required them to do. Finally, the People have offered no authority to support ex parte modification of the agreement to include additional conditions due to events that transpired following defendant's successful completion of the Veritas program; nor is the record adequate to permit appellate review of the court's exercise of discretion in departing from the terms of the negotiated plea agreement.

Accordingly, the judgment should be reversed and the indictment dismissed.

SULLIVAN and McGUIRE, JJ., concur with BUCKLEY, J.; TOM, J.P., and SAXE, J., dissent in a separate opinion by TOM, J.P.

Judgment, Supreme Court, New York County, rendered June 6, 2004, affirmed.